May it please the Court, David Neff on behalf of the appellant, who we will call the lender. So we have two legal issues on appeal. One is whether class acceptance in a joint plan is determined per debtor or per plan. And the other is whether a lender is entitled to full due-on-sale protection any time that it makes an 1111B election. Counsel, before you get too far, I want to be sure of one thing. Am I correct in saying that the bankruptcy judge's determination that this was fair and equitable is not being appealed? It was stipulated to or at least not appealed. Is that correct? What we are appealing is her legal determination on the two issues. Assuming that she was correct legally, we have not challenged her factual findings. Right. Okay. I just wanted to be sure. Because, of course, this does play into ultimately how the statute is understood, right? Right. So, and I think as even the debtor now concedes, the Court must first make a determination de novo on the two issues. So that's what I'd like to confine my arguments to. If we could start perhaps with the one debtor, one plan issue. There is no basis in the Bankruptcy Code for a joint plan where each debtor is not required to meet the standard of confirmation in Section 1129, absent substantive consolidation. There was no substantive consolidation here. That's admitted. That was a statement in the disclosure statement. Is there any difference between what happened here and what it would have looked like if there had been substantive consolidation? Because I'm quite confused about why it kind of looks like this was treated like substantive consolidation. That's an excellent question. First of all, there could never be substantive consolidation because the standard could not have been met here. Substantive consolidation is a very difficult standard to meet. But so I guess what I'm struggling with is if in fact everyone was sort of acting like this was substantive consolidation, then maybe you should have objected, hey, wait a second, there never was substantive consolidation officially, and so why are you all doing this? That in essence was what the objection was, that each debtor has to satisfy the plan confirmation requirements. Most importantly, each of the debtors had to show that it had an accepting impaired class. That in essence was the objection that was made. And the disclosure statement said there was no substantive consolidation. But the district court said a plain reading tells me. And it's a nice place to start. I mean, we don't modify by interpretation the statute. The legislature has to make those determinations. And if the legislator could have said, it could have said that it required each debtor, but didn't. It talked about plans. If you look at section 1129A and each one of the requirements, it's clear the bankruptcy code only contemplates one plan impacting one debtor, one plan by one debtor. It talks about the plan, and it talks about the plan proponent. It never talks about plans. It never contemplates multiple debtors being impacted by a single plan. And in fact, the only way you could have that is if the debtors could establish substantive consolidation, which they couldn't in this case. What you're saying is perhaps the legislator should have done a better job. But he takes a look at it for what the legislature does. And he says, I don't see this as other than plain meaning of what they mean. They could have said it differently. And you're saying they could have said it differently. Well, no. What I'm saying, in fact, it was pointed out in the Tribune decision that under the bankruptcy rules of interpretation, I believe it's section 1027, the singular shall include the plural. The reading by the Tribune decision is that, therefore, when you file a joint plan involving multiple debtors, you're in essence filing multiple plans for each debtor just subsumed in one document called a joint plan. Not unusual in bankruptcy, but you still have to show that each of the debtors satisfies each of the requirements of section 1129A. And where do you get that out of the actual statute? Well, if you look at section 1027. No, you went outside it. In looking at 1129A10, what is the wording in there that lets you know that you're right? It talks about the plan, which section 1027 says you interpret as the plans, which in essence is what was filed in this case. But if you take the 1027, at least as I look at it, that would really amend the statute to read, in quotes, at least one class of claims that is impaired under the plans has accepted the plans. That's what that could be construed to mean under 1027. That doesn't really help you, does it? Well, it's each per debtor. Each debtor has an accepting impaired class. That's what should be required in this case. You know, one of the problems I have with this case is that both sides are really wrapped up in the facts, and yet we're trying to construe a statute. And, you know, in this case, you've got a situation where, I guess, your client acquired the mezzanine loan, if you will, and then used that to, in effect, veto this plan. The mezzanine loan was worthless in terms of its original status because that was secured by the equity of the mezzanine holders, their equity. It's gone. Now, you've consolidated them under the statute, you've converted it so they would be secured. But it seems to me kind of, if you will, a little unjust that something that was, in fact, supposed to be used in this way to veto a plan that affects so many people, so many dollars. And we know, and I think you would concede, the whole purpose of Chapter 11 is to make a company that might otherwise, or a property otherwise fail, survive. Everybody gets a little hit because there's not enough money. But I'm just troubled by the fact that it's this effectively worthless portion of the loan that you've now made into a secured loan that seems to be the trouble here. I would take issue with Your Honor calling it worthless. From a balance sheet perspective, there's no equity. I'll give you that. I'll call it that. There's no equity. It has no security for it. But there is value in control. And in fact, the whole basis of mezzanine lending is that if there's a default, you get to step into the shoes of the borrower. Had there been no bankruptcy, or had there been no bankruptcy of the Mez debtors, there would have been a UCC foreclosure sale. The Mez lender then would have assumed control of the operating debtors and would have filed its own plan, or done something different than what was ultimately done. It was only by virtue of the Mez debtors having filed for bankruptcy. Now, what the bargain was before bankruptcy was for the Mez lender to be able to step into the shoes. And in this particular instance, that was not allowed and the Mez lender ended up getting nothing. So if I could just give you what I believe the consequence is for Mez lenders of a ruling that affirms. Mez lenders have no meaningful vote because they can't block the plan confirmation, which was the basis upon which they made their Mez loan to begin with, is that they'd be the only creditor and have that ability in a bankruptcy. They're not entitled to stay relief. Excuse me, just so I'm sure I understand that, is there anything in the documents that says that's what the Mez lender in this case intended and relied upon? Well, there's nothing there's nothing in the record to show that that's just my understanding of the basis of Mezzanine lending, is that you're the only creditor and if there's a bankruptcy being the only creditor. I understand. I've done a lot of lawyering for Mez lenders and I've never heard anybody say that that was a lead pipe thing and that was a big deal while you did it. Most Mez lenders do it because they think they're going to make money, not because they're going to have a vote in bankruptcy. So I want to be sure. But here you purchased them so you'd get the vote, right? So, I mean, it's very clear here. Right. But whether, obviously, whether we bought the vote or not, however you rule, it's going to apply, obviously, in other cases. So that number one is you have no ability to block confirmation, which is what the documents gave you. You're not entitled to stay relief, even though there's no equity in the collateral, because the debtor potentially can file a joint plan with the operating debtors and thereby get its one accepting impaired class. But if you're right, and I apologize for interrupting, if you're right, why would somebody like Southwest Value Partners get in this in the first place? Why would anybody come in and say, let's say this property, if you know that the Mez lender who no longer has an equity can block anything that you do? Well, I can't speak specifically for Southwest Value Partners, but why would anyone get in? Why would anybody do it? We look at this situation. They allegedly put in 60 to 80 million dollars. Obviously, they think they're going to make money here. Obviously, they must have thought that they came into a situation where the property was at a very low valuation at 92 million dollars and was going to appreciate. They thought they had an equitable mootness. Our panel decided otherwise, but they thought it was a done deal. They were going to get interest only. That's all they're getting until they can get it out. But if they knew that your client had the right to veto what they wanted to do, why would they do it? Why would anybody do it? Well, they never would have gotten into that situation because the plan would not have been confirmed, and presumably then, well, but then the lender would have stepped in and confirmed its own plan. I mean, we can speculate that the lender would have ultimately taken over the hotel. The hotel was not going to close. Maybe. I would. So I would love to hear the rest of your list, because I'm very curious about what the policy implications are of this rule. So here's what your ruling will mean for, or here's what the district court's ruling means for MES lenders. No meaningful vote, can't block confirmation, not entitled to stay relief because the debtor might be able to confirm a plan based on how they did it here. They're not entitled to any payment on their claim because of the absolute priority rule as it applies to the creditors at the operating debtor level. They have no standing to be heard in the operating debtors bankruptcy because they're not creditors. Even though there's now this ex post facto substantive consolidation, it hadn't occurred before plan confirmation. So they had no standing to be heard in the operating debtors cases. And they can't raise the absolute priority rule because the MES debtors owner is not receiving or retaining any property under the plan. So they have no ability to ask the judge to terminate exclusivity or to allow it to put in a competing bid based on the Supreme Court's two or three north of south decision. So ultimately what it means is where the underlying property is worth less than what the mortgage holder is owed, the MES lending lender always loses. So I understand why your client doesn't want that, but I am having trouble understanding if that's bad in general. So it seems like putting aside the fairness of this case and what the expectations were when the investments were made, going forward, people will make their investments knowing what this new rule is. And can you help me with why it would be a bad world for mezzanine lenders to have less, have this regime you just described? Well, if they end up with this type of situation where they have, unlike how the MES debtors could not have an accepting impaired class, then MES lenders know that in a bankruptcy, if this is what the rule is, that they will have no rights and they will always lose. But so does that just mean there will never be MES debt, MES lenders? I mean, what would the world look like? What MES lenders bargain for, one of the rights they bargain for is the right to step into the shoes of the borrower. And so if they didn't have that, then does that just mean there would never be this kind of structure or would something else happen? I'm trying to figure out if it's good or bad in this alternative universe that would get created. Well, I think the ruling would be very bad for MES lenders. For the ones who already exist. But what about the ones in the future? I mean, would they even exist in the future? I would think that they would be less likely to want to lend into a situation like this if they would end up with nothing. And I think it goes beyond MES. And is that bad for the world in some way? I mean, if there are no MES lenders, what happens to these structures? Well, that's an excellent question. If you go the other way, then people like Southwest Value Partners wouldn't want to come in either. So either way, it's a bad outcome, right? Well, I'm not sure that that is true. That ultimately, you're going to get some form of a restructuring of the property because you would otherwise get it restructured by the MES lender. MES lender would step into the shoes. Do you want to save any of your time, counsel? We didn't talk about that. I'm sorry. Can you just answer this question, the question about why would it be bad for the world if people don't want to be MES lenders? You just would have far fewer transactions. MES lending exists to bridge the gap where someone who wants to acquire property can only get 65 or 70 percent loan to the value and only has 10 or 15 percent of equity. The MES lender bridges that gap. You just simply won't have those transactions. If I could reserve the remaining amount of time. Okay, very good. Thank you, counsel. Good afternoon. May it please the Court. Donald English on behalf of the appellants, the reorganized debtors through Southwest Value Partners. Given where the comments have been made by Mr. Neff, including the confirmation that the fair and equitable findings of Judge Hollowell focus my comments as such, but I do think there may be a reason to come back and revisit that simply for the reasons that were just heard, which is the flight of the MES debtors. Even in this case, for example, Judge Hollowell did an 1129B analysis in fair and equitable as to the MES lender in this particular case, specifically under 1129A8, which required her to do so because they voted against the plan. And she found, in fact, there was an indubitable equivalent as to their value. That value, by the way, was a nature of their own doing back in 2007 when they underwrote this project. They underwrote the structure, the project, the independent entities. But they wouldn't have if they had known that you might win this case, right? If you win this case, do you agree with him that mezzanine lenders wouldn't enter these kind of arrangements? I don't know that they would enter the arrangement in which they would be in a situation like this, but they may say we need additional security, we need a personal guarantee, we need additional protections if, in fact, we actually underwrite the same transaction in the same way. I, for one, looking back on the economic crisis in 2008 and 2009, perhaps think that things were overheated. This was a 2007 transaction, and perhaps it needed to have a little more conservatives in the underwriting. And perhaps the MES lender should have looked for other sources of collateral other than the equity in the debtor, in the operating debtor. And perhaps, perhaps even take a look at the relationship with the senior lender. Recall, and in the record, the intercreditor agreements, the subordination agreements, and the like, they put themselves below the senior lender. And by the way, we do have two appeals today, one on behalf of the senior lender regarding the 1111B alteration of a loan document, not a reversal of a plan. They're not asking for a reversal of the plan today. No one is. They're only asking for a change of the senior lender. The confirmation order is not to be set aside. They're not asking for that, and I can show you in their papers whether or not. And on the other side there, they represent the MES lender. Now, I want to suggest just a point, and it occurred to me, if the MES lender had filed this appeal, Mr. Neff would be sitting with me on this other table opposing MES lender's relief under all the reasons he just said because of the reason the MES lender is being frozen out here, because the senior lender had the senior position and made the election under 1111B, that being said. Now, I want to point out something which I think is cogent for the points you raised, Your Honor, and that is why should we have a per plan versus a per debtor, and why does it work in this particular setting, and why did it work with all the other cases with the rare exception of Tribune? Jameson, by the way, with the motion to dismiss, wasn't fully developed, bad faith filing, et cetera. I'm going to let that off to the side unless you need me to drill down on it more. In this case, I did something, and I did it late last night. I did a little mind map of the facts of each of those cases, and I looked at it, and a couple of things struck me. We really have an evolution of how business has been run in the last 15, 20, maybe 30 years. Everything's being run by special purpose entities. Everything's being run by separate entities. We don't longer have one large corporation. We have a holding company with subsidiaries, and then we have a single business that does everything together with all of those subsidiaries operating together. That was certainly the facts in the SPGA case, where we have a single holding company and 10 subsidiaries, and we have one plan being submitted under a very important code provision, 1015, joint administration. You have to reconcile. But what was the difference between how this was handled and substantive consolidation? How this, meaning SPGA, or how this entrenched was in our case? In our case, you're saying it was joint administration, but it looks a lot like a separate entity, doesn't it? Well, it could, in fact, because of the joint administration, say I'm going to look at all aspects, but the separateness of the entities and the bargain force structure that was put in place in 2007 was respected. And in fact, what happened in this case, the operating debtors, the owners of the property, were reorganized in going forward, and we're in just about year six of a very successful Chapter 11 reorganization. Let's don't lose sight of the exact purpose that Judge Smith said is the policy behind this. So what you have here is you respect those entities. So what would have been different about how the assets were treated if it had been substantively consolidated? As to the MES lender, nothing. So why is it different? I thought you were just saying it was different. So it looks like it was treated like substantive consolidation. So tell me why it wasn't, why this wasn't some kind of, like, de facto substantive consolidation. Well, in reality, the separateness of the various entities was kept intact. In other words, the ownership structures, the actual structures, the holding company was ultimately dismissed and is no longer available. The MES debtors have now been dissolved and they've moved on. I was making a slightly different point, if I could just let me go back to it. Each of the cases that we cited, from SBGA to the Morgan Chase Charter Communication to Stations Casino, all involve a situation to where there is a single plan under 1015 in joint administration. But the reason isn't because of somebody cobbling together various interests. It's because the business had a reason and a purpose to exist in the first place and was hoping to exit the Chapter 11 reorganization as an operating business going forward and needed this structure. Now, there are several reasons these cases have said the joint administration was proper, and that's a gatekeeper by the bankruptcy judge to be able to do that. Now, in one, it was because that's how the businesses were run. SPGA, all the subsidiaries with no active employees or anything else, all the employees at the holding company running these, they needed all of them to go forward. And when you have the different tranches of classes, the senior lenders and the junior lenders and the like, that's, you know, get your paired class voting in favor, you move forward and you do your 10 or 1129B analysis and you go on. Now, in another one, it was the structure of the lender that drove it. In another one, there was a structure of contracts along with the business that drove it as to why that was important. So my point this morning or this afternoon, sorry, is that these cases, as they have viewed as to the requirement as to per plan or per debtor, have looked at it as to the viable business reasons, the entity that came into bankruptcy. Now, again, I postulate that 30 years ago or 40 years ago when I was in business school, this would have been a single entity, a corporation that had four divisions or 10 divisions, but all within one company. But nowadays, with the advice of transactional lawyers, there's separate entities and separate policies for insurance reasons. But if it was one entity, it would have been one plan. And I think part of their argument is the bankruptcy code anticipates that it would be one entity with one plan. But here we've got multiple debtors and he's saying it should have been multiple plans, but somehow we get this one plan, which seems a lot like substantive consolidation. So how did that happen? Well, in reality, in this particular case, there was no substantive consolidation. There didn't need to be substantive consolidation. There was, in fact, one plan for our five debtors. And the question here. Didn't the plan or one of the documents actually state that everybody agreed it would not be a substantive consolidation? Yes, that's true. That's why it's not, yeah. The disclosure statement did, in fact, say that. And I'm going to go back to that. So is your argument that they waived? I mean, if it was only one entity, then it's one plan. And of course, it's only one objection. But if it's multiple plans, then they have a better argument. And I don't quite understand whose fault it is that it seems like things proceeded as almost like there had been substantive consolidation, even though everyone was saying there wasn't. I'm still confused about how that happened. Well, let me tell you my perspective. I don't think they're mutually exclusive. I believe you can have a single debtor with a single business and a single plan. And we all know how the rules would be applied. And we have over here substantive consolidation of disparate entities that are now going to be substantive consolidated, as well as getting rid of the corporate structures and basically having all creditors available to all assets of all those entities. And then in the middle, we have traditionally the ability to have joint administration of multiple debtors and to propose a single plan. They're not mutually exclusive. Each of those are different buckets into the procedural abilities for a practitioner and a bankruptcy judge to use. And here the question is on a joint administrated one joint plan, how the statute, it says debtor or plan, et cetera. But if the mezzanine debtors had had their own plan, then they clearly would have had the right to object if they were the only ones. Right. If those lend. I mean, if that had been a separate plan, then this all would have happened differently because they they would. But it would have also destroyed the integral structure that was set in place in 2007 by these specific lenders. This is how the structure was set up. This was the operating group of entities. This is how it was presented. This is what was dealt. So now in dealing with that, you have separate. Are you saying that that's what they did when they set up these loans originally or when they set up the loans originally? So you're saying it was the lender's idea to structure it with all these levels? That's true. It was. And that's how the intercreditor agreements, that's all the other documents. And that's what I said. And I just postulated if the Mez lender were standing here rather than an assignee as the senior lender, Mr. Neff would be making arguments on my side, saying the Mez lender made that deal. They were 160 million dollars below water. They had no value in this. Their security interest is worthless. It needs to be canceled to be able to have an effective Chapter 11 reorganization. So on and so forth. So the corporate structure that had these wholly owned subsidiaries, you're saying that structure was dictated by the lenders? Yes. I gather that your argument would be that I don't know what the exact number is, but it sounds like Tribune is the isolation. I mean, it's a rare out-in-the-field approach. And the others are the approach you think is the majority and better rule. I have my thoughts on Tribune, although in reality, I think that the better reason cases are the ones that are single planner joint consolidation. There were 111 debtors in Tribune, but they had disparate businesses. They had newspaper operations.  They had, I can't remember all of them. But if you read it, the opinion is 84 pages. I mean, you read it and you sit there and go, oh, my goodness. Now, I can see if I had a whiteboard, I could put maybe 30 of those in one plan, and I could put another 20 in another plan, and I could perhaps do that, and I could structure classes that would be appropriate, and I could perhaps get a joint plan for additional more than one debtor. But when Judge Kerry was presented with competing plans, he wasn't given that luxury. And his initial ruling, as you recall, was that neither one would be fair and equitable to the objecting parties, which I thought was instructive because he basically would say, go back and work on this and come back when you have it worked out a little bit better. I'm running short on time, but I'd love to address any other questions, including Judge Wallace, if you have something for me. I was going to slip in, if you don't mind. I would love it. You look like you're ready. So far, you've been discussing the bankruptcy, Judge. My understanding is that what we have before us is the district court's opinion. That's true. And that's the one that the appeal came from. That's true. Now, Judge Collins, take a look at this. He looked at the statute, and he decided that it's very clear there may be reasons why other things could be done, but he looked at the statute and said it was going to be per plan. That's true. Do you, I haven't heard you discuss this so far, but do you agree with the district judge that that is appropriate to look at the statute and make the determination based upon what the legislature has given him in the bankruptcy code? On the first issue, absolutely. On the first issue, on both parts of the appeal, you would have to look at the statute and to do an interpretation of the plain meaning of the statute. I agree. And may I make one observation about Judge Collins' opinion? Of all of the cases that have been cited to you by both sides on 1129A10, he is the only one who has a review process in this. He is the only reviewing intermediate court that's ever addressed this, because remember, the original order was from Judge Hollowell, which is the same level as Tribune. The original order by Judge Hollowell is the same level as SPGA. So I actually give a little more weight to Judge Collins and the time he spent, including the afternoon he gave us to argue. Now, during that time period, he did allow us to present, and we have different demonstratives, including various parts of the statute that we pulled out. And we had a very healthy dialogue, as you see from the transcript, with Judge Collins during that hearing. And he did ask Mr. Neff similar questions. He asked me and Ms. Boswell similar questions. And I would suggest taking a look at some of the demonstratives that Judge Collins found helpful in understanding what Judge Hollowell did in the context of not only the legal rulings, the de novo ruling on the statute, but also on the fair and equitable findings, which he found, of course, in clear error in favor of affirming Judge Hollowell. Okay. I have a minute and 29. I have so much more to say. What would you like me to say? I guess I would, just following up on what my colleague just mentioned, I was impressed with Judge Collins' opinion. Yes. And like you, I treated it, in effect, as a reviewing, if you will, appellate decision in the sense it was reviewing the bankruptcy judge situation. Most of the time when people appeal bankruptcy orders to district judges, it's because they don't know anything about bankruptcy law and they can kind of do whatever they want. But in this case, Judge Collins did a really, really, really good job. Is there anything in his opinion with which you strongly disagree? No. As a matter of fact, no. He did get one fact wrong. The amount of the claim by the senior lender was $298 million and he has in there $209, the original amount of the loan. But that's an inconsequential technicality and we chose not to put it out as far as changing the order. No, I think he walked through correctly both the legal and the equitable decisions that had to be made, giving deference to both standards of review. And I think that in the process of doing so, he did, in fact, do a proper review. And you agree that's a de novo review? On the initial issue as to the interpretation of the statute, yes. But when Judge Hollowell then, under 1129B, for both the senior lender under 1111B and under the Mez lender under 1129A10, does the fair and equitable findings, those are clear error standards. And she went through, for example, for the Mez lender as to why the Mez lenders was in a position that was fair and equitable, had the inducible equivalent of what would be received in either Chapter 7 or going forward. So we know that the court does a two-step analysis in bankruptcy. The initial is the legal. Here's what the rule says. And now, whether or not someone objects, senior lender, Mez lender, I now need to make the second analysis under 1129A8. And I believe that's very, very important because it is a two-step analysis. And by the way, initially in the issues presented, both issues were presented, and I appreciate the clarity from Mr. Neff today that only the legal issue and the other one is there. But I believe once you have the legal issue and no challenging the fine work that Judge Hollowell did and the in-depth and the transcripts and the completed record we've been able to provide to you, you see the work that she's done. Okay. Do either of my colleagues have other questions? You've gone over time. So other questions that anybody has? Thank you very much. Thank you very, very much. I appreciate it. So we're going to hear from Mr. Neff again. I believe I have 21 seconds. We never reached the second issue, but I hope that it was well briefed. We've all read that and prepared well for it, I hope. The result here is ex post facto subs of consolidation. There is no basis for it in the law. And a ruling to that effect will have major ramifications, not only with regard to mezzanine lending, but other types of debtors, other types of lending into situations. Do you agree with his description of the corporate structure being dictated by the lenders? Because if that's true, if there's no real purpose for this structure other than for the lenders, it feels like the lenders could work this all out somehow. The structure here would have been dictated by the debtor's equity holder's desire to acquire the property and need to obtain a mortgage loan as well as a mezzanine loan. The first mortgage lender would not allow there to be a second mortgage holder. So the only way to acquire funds to bridge that gap that I talked about earlier would be to get a mezzanine loan, which in essence is a subordinated position to the senior lender, but most importantly, with the control rights, the rights to step into the shoes. And ultimately what this case was about was $2 million going back in the pockets of the equity holders that never should have happened. Let me just ask one last question. You have given us a cataclysmic suggestion as to what will happen if this is affirmed. On the other hand, if it's not affirmed, can't the same be said as to people who might come in with new capital to restructure something? Wouldn't they be frightened by the ability of someone in your clients, not the senior lender, but the other lender, to frustrate a plan of reorganization? Well, the bargain here by the debtor when they got the loan, by the debtor's equity holders, was to the mezz lender, if I go into default, you have the right to take over in essence and control the decision making for the operating debtors. And what would have occurred in this case is the mezz lender would have stepped into the shoes and basically been the debtor, basically made the decisions for the operating debtors and could have chosen to file its own plan and then would have been at battle with the senior lender. Okay. I guess we get your point. Any other questions? Thank you both, counsel. Thank you. I think this argument is submitted and the court will stand at recess.
judges: Wallace, M. Smith, Friedland